## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBRA A. KRUGER, | : | |
| Administratrix for the | : | Civil Action |
| Estate of John H. Kruger, and | : | No. 12-cv-06248 |
| DEBRA A. KRUGER, Individually, | : | |
| | : | |
| Plaintiffs | : | |
| v. | : | |
| | : | |
| LANCASTER COUNTY; | : | |
| PRIME CARE MEDICAL, INC. | : | |
| trading as and doing business as | : | |
| Prime Care Medical, | : | |
| trading as and doing business as | : | |
| Prime Care; | : | |
| VINCENT GUARINI; | : | |
| ROBERT SHAMBAUGH, M.D.; and | : | |
| ELICIA STEIN, | : | |
| | : | |
| Defendants | : | |
| | : | |
| | : | |
| DEBRA A. KRUGER, | : | |
| Administratrix for the | : | Civil Action |
| Estate of John H. Kruger, and | : | No. 13-cv-01514 |
| DEBRA A. KRUGER, Individually, | : | |
| | : | |
| Plaintiffs | : | |
| v. | : | |
| | : | |
| LANCASTER COUNTY, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM OPINION

**Henry S. Perkin, M.J.**                                                    **March 9, 2015**

This matter is before the Court on Defendants Lancaster County and Warden

Vincent A. Guarini's Motion for Summary Judgment and the Motion for Summary Judgment of

Primecare Medical, Inc., Dr. Robert Shambaugh, and Dr. Elicia Stein, both of which were filed

July 15, 2014.  In conjunction with these motions, Defendants filed their respective statements of undisputed facts and briefs in support thereof.  Plaintiffs' Brief in Opposition to the Motions of Summary Judgment of Defendants' Lancaster County, Warden Guarini, Primecare Medical, Inc., Dr. Robert Shambaugh and Dr. Elicia Stein was filed August 15, 2014.  In so doing, Plaintiffs responded to the statements of undisputed facts submitted by the Defendants, and also filed their own counter statement of undisputed facts, which was subsequently responded to by the Primecare Medical Defendants on August 29, 2014.  The Reply Brief of Defendants Lancaster County and Warden Vincent A. Guarini to Plaintiffs' Response Contra Defendants' Motion for Summary Judgment was filed with leave of Court on October 6, 2014.  Having reviewed and considered the contentions of the parties, the Court is prepared to rule on this matter.

I.    Background

        Based upon the record papers, exhibits, depositions, and the parties' statements of facts, the pertinent facts to this Court's determination are as follows:

        Plaintiff Debra Kruger ("Plaintiff") was married to John Kruger ("Kruger" or "Decedent").  Prior to his incarceration at the Lancaster County Prison, Kruger evidenced a decline in his mental health which manifested in behavior identified by Plaintiff as cause for serious concern.  At Plaintiff's urging, Kruger agreed to see his family physician, General Internal Medicine of Lancaster County on January 17, 2011.  At that visit, Kruger reported becoming more and more depressed.  It was reported that he was dealing with four stressors including his father's terminal illness, his own unemployment, financial difficulties, and the prospect of losing the family home.  The record of January 16, 2011 indicates that he had reported being suicidal to his wife and other family members.  During the visit on January 17,

2011, Kruger agreed that he would seek psychiatric help.

Later that evening of January 17, 2011, Kruger assaulted Plaintiff, choking her and forcing her to the ground in the marital home.  Kruger at some point ended the assault, and he called 911, telling the police officers that he had put his hands around his wife's neck.  Kruger was arrested, charged with simple assault, and committed to Lancaster County Prison where Vincent Guarini ("Warden Guarini") was the Warden at the time.

Upon being committed to Lancaster County Prison, Kruger underwent intake screening and health assessments.  Kruger's intake screening was performed by Tina Trudel ("Trudel"), a Medical Assistant employed by PrimeCare Medical, Inc. ("PrimeCare").  During this period of time, Lancaster County contracted with PrimeCare to provide inmates with medical, dental, and mental health services at Lancaster County Prison.

During the course of the assessment, Trudel performed an Intake Suicide Screening on Kruger.  This suicide screen requires that a suicide watch be initiated if the patient scores an eight or more on the form.  With respect to Kruger, Trudel recorded a score of five. Kruger had positive responses for each of the following: a past suicide attempt; his first incarceration; showing signs of depression; appearing anxious, panicked, afraid, or angry; and acting or talking in a strange manor.  Plaintiff, however, denies that this form was accurately recorded, and asserts that Trudel failed to identify an additional three risk factors including: experiencing a recent loss of job; worrying about financial problems and a fear of losing his home; and a history of alcohol abuse.  Irrespective of the score on the suicide screen, a mental health clinician may be contacted by the person conducting the intake to conduct a mental health evaluation.

3

In addition to the suicide screen, Trudel also performed a Mental Health Screen for Men.  If the inmate answers "yes" to six or more of the items, or if the intake person is concerned for any reason, mental health is to be contacted.  On the mental health screen, Kruger registered a score of five with the following affirmative responses: he tended to hold grudges or give people the silent treatment for days at a time; he tried to avoid reminders or not to think about something terrible that he experienced or witnessed; there was a time when he felt depressed for most of the day for at least two weeks; he had been troubled by repeated thoughts, feelings, or nightmares about something he had experienced or witnessed; and he had felt constantly on guard or watchful even when he did not need to or felt jumpy and easily startled.  Again, Plaintiff disputes that the score was properly recorded.  Rather, Plaintiff asserts that Trudel miscounted, and failed to include Kruger's affirmative response that there have been times that he felt so irritable that he found himself shouting at people or starting fights or arguments.

Trudel contacted Elicia Stein ("Stein"), another employee of Primecare who provided mental health services to inmates.[1]  On January 18, 2011, Stein performed a mental health examination of Kruger.  As part of her reporting, Stein recorded that this was Kruger's first time being incarcerated, and noted that this was considered an increased risk factor in that someone can have more difficulties coping or dealing with being incarcerated if it is their first time.  Stein indicated that Kruger reported a prior suicide attempt by carbon monoxide poisoning approximately fifteen years prior, and had a recent "suicidal ideation."

---

[1]    The parties disagree as to Elicia Stein's credentials at the time she performed the mental health assessment of Kruger.  Defendants aver that Stein was a psychologist, while Plaintiff denies that Stein was a licensed psychologist on January 18, 2011.

4

Stein concluded that Kruger's suicide risk was moderate, and his judgment was impaired.  She diagnosed depressive disorder, NOS.  More specifically, Stein documented the following:

> Distracted, poor focus, oriented x 4, speech mumbling, slow, quiet, mood significantly depressed, flat affect, possible psychosis or paranoia based on presentation, unclear about suicidal ideation, judgment impaired, insight poor, memory impaired, patient not able to report history well.

Following her assessment, and because of her concerns as to Kruger's presentation, Stein determined that it was appropriate for Kruger to be placed on a Level II suicide watch.[2]  After consulting with Robert Shambaugh ("Shambaugh"), a PrimeCare psychologist,[3] Stein placed Kruger on a Level II suicide watch, and Kruger was placed in a cell on the Medical Housing Unit ("MHU").

Shambaugh, who supervised the MHU for PrimeCare at Lancaster County Prison, first met with Kruger on January 19, 2011.  Although he did not think that Kruger was a suicide risk, he believed it was appropriate at the time to continue Kruger on a Level II suicide watch.  On January 20, 2011, Shambaugh approached Kruger's cell, and commenced a conversation with Kruger, during which Kruger asked Shambaugh what it was that he was doing with Kruger's daughter.  At the time, Kruger believed that his daughter was standing behind Shambaugh.

---

[2]    Lancaster County Prison has established policies to prevent suicide. There are three different levels of mental health observation for inmates: (1) Suicide Watch I ("SWI") for inmates who display suicidal behavior or continuous self-injurious behavior and require daily checks by medical/mental health staff and housing in a camera cell, (2) Suicide Watch II ("SWII") for inmates who do not present is a clear risk of suicide, but still require daily monitoring and placement in a camera cell, and (3) Psychological Observation III ("PO III") for inmates who do not require a camera cell and can be placed throughout the prison. PO III is not considered a suicide watch status.  Only PrimeCare psychologists, psychiatrists, or physicians are authorized to change an inmate's mental health observation status.

[3]    Shambaugh was not a licensed psychologist at any time relevant hereto.  In fact, Shambaugh did not become licensed until after Kruger committed suicide.

5

Following this visit, Shambaugh changed Kruger's diagnosis to "psychotic disorder NOS," and reported that Kruger had impaired judgment and insight.  Kruger did not deny or confirm suicidal and/or homicidal ideation.  In fact, Plaintiff avers that Kruger would often remain silent when specifically asked if he was suicidal.

Stein evaluated Kruger on January 21, 2011.  At that visit, Stein wanted to rule out a psychotic disorder versus alcohol withdrawal.  Stein recorded the following subjective assessment:

> Reviewed suicide status II.  Patient making numerous nonsensical statements.  Told this clinician 'Jesus Christ is going to whoop your ass.'  Some paranoid statements but not clear. Would not respond to questions assessing any symptoms he may be experiencing, including hallucinations. Repeatedly saying 'whatever,' or answering questions with laughter. Tried to discuss with patient whether he would like to see psychiatry for meds, whether he feels he needs meds, but patient was not cooperative with this discussion.

Stein concluded that Kruger's thoughts appeared delusional, paranoid, and disorganized. Kruger's judgment was poor, and he had no insight.  At this time, Stein referred Kruger to Marc Turgeon, D.O., a psychiatrist employed by PrimeCare.  The plan at the time was to maintain Kruger on suicide watch.

During the morning of January 24, 2011, Shambaugh was advised by Kruger's brother-in-law that Kruger's father had died the previous night.  During that conversation, Kruger's brother-in-law also advised Shambaugh that he believed that Kruger may have a mental problem because he was acting strange the week prior to his incarceration, and had no mental health history.  Later that day, Shambaugh and a prison chaplain advised Kruger that his father

had passed away the previous night.  Shambaugh testified that Kruger showed no reaction to this news.

During the January 24, 2011 visit, Kruger also advised Shambaugh that he did not want his family to try to bail him out.  Shambaugh attributed Kruger's reluctance to being bailed out to the fact that he didn't understand what was going on and/or that he was afraid and didn't trust anybody.  Kruger failed to give a verbal reply to the question that asked whether he was suicidal or not, and Shambaugh noted that "his nod may be taken as a no."

On January 25, 2011, Shambaugh removed Kruger from Level II suicide watch, and placed Kruger on Psychological Observation III ("PO III") status.  Shambaugh thought that removal of the Level II suicide watch would assist in getting Kruger out of isolation, and allow him to be able to mix with other inmates more easily.  According to Lancaster County Prison policies and procedures, an inmate who is on PO III status is free to interact with other inmates and move about the first or second floors of the cell block.

Shambaugh next saw him on January 27, 2011, and his notes indicate that Kruger had refused the family's attempt to bail him out the previous night, stating that he believed that the family "wants to wipe him out and that he wiped out his family."  Kruger told Shambaugh that he knew what Shambaugh was up to, and that he did not believe Shambaugh.  Shambaugh offered the assessment that Kruger was not oriented to his situation, he appeared to be having hallucinations and delusions, and was paranoid.  Kruger's judgment and insight were impaired.  Kruger's diagnosis was delusional disorder, non-bizarre, paranoid.

Shambaugh testified that around this period of time, he received the family doctor records of General Internal Medicine of Lancaster.  Those records revealed to Shambaugh that

Kruger was suicidal on January 17, 2011.  Shambaugh testified that by the time they received

Kruger's family doctor records, he was already off Level II suicide watch.  Shambaugh testified

that if he had received the family doctor records earlier, Kruger would have remained on suicide

watch.

On January 28, 2011, Kruger refused the medications of Risperdal and Ativan,

which were prescribed to address paranoid behavior, paranoid speech, and delusional speech.

Neither Lancaster County Prison nor PrimeCare had the authority to compel medications upon

Kruger.  Shambaugh decided to submit an application for a Section 302 involuntary mental

health commitment ("302 Petition").  Shambaugh believed that a change of environment for

Kruger could potentially help his mental health status.

Shambaugh had conversations with Kruger's brother-in-law wherein a plan was

formulated to try and have Kruger bailed out of the prison.  Specifically, Shambaugh would

complete the Section 302 application, and Kruger's family would have a bail bondsman available

so that Kruger could post bail.  The plan was to have Kruger complete the bail paperwork while

at the hospital being assessed for a possible 302 commitment.  However, as Plaintiff contends,

Kruger was psychotic and paranoid at the time, and believed that he would be killed if he left the

prison.  As a result, Kruger refused to be bailed out.

Regardless, Shambaugh completed the 302 Petition, and submitted it on February

1, 2011.  Whenever a 302 Petition was submitted by PrimeCare, Warden Guarini would be

notified.  In fact, Warden Guarini testified that while it may not be at precisely the same time, the

"Warden gets told everything."  In the 302 Petition, Shambaugh offered the opinion, under

penalty of criminal prosecution, that he believed there existed clear and convincing evidence that

Kruger was in need of emergency mental health care.  More specifically, Shambaugh opined that

Kruger was "severely mentally disabled,"[4] and posed "a clear and present danger of harm to

others or himself" by checking off the following paragraphs:

> Clear and present danger to others shall be shown by establishing
> that within the past 30 days the person has inflicted or attempted to
> inflict serious bodily harm on another and that there is a reasonable
> probability that such conduct will be repeated. A clear and present
> danger of harm to others may be demonstrated by proof that the
> person has made threats of harm and has committed acts in
> furtherance of the threat to commit harm; or

> Clear and present danger to himself shall be shown by establishing
> that within the past 30 days;

>> (i) the person has acted in such manner as to evidence that
>> he/she would be unable, without care, supervision and the
>> continued assistance of others, to satisfy his/her need for
>> nourishment, personal or medical care, shelter, or
>> self-protection and safety, and that there is reasonable
>> probability that death, serious bodily injury or serious
>> physical debilitation would ensue within 30 days unless
>> adequate treatment were afforded under the act.

The information that Shambaugh provided in the narrative portion of the 302

Petition states as follows:

> Patient on 1-17-11 attempted to strangle his wife, Debra and was
> incarcerated on 1-18-11.  Since then patient has been unable to care
> for his basic needs; not eating very much, showering and hygiene.
> Patient refused to be bailed out of jail on 1-27-11; he is delusional,
> but mostly paranoid.  The family noticed the change in patient's
> behavior a week before his arrest.  We are concerned his behavior

---

[4] According to the form, "[a] person is severely mentally disabled when, as a result of mental illness, his/her capacity to exercise self-control, judgment and discretion in the conduct of his/her affairs and social relations or to care for his/her personal needs is so lessened that he/she poses a clear and present danger of harm to others or to himself or herself."

> is unpredictable as long as he remains psychotic and paranoid and
> could hurt someone again.  Patient refuses medications; no insight,
> judgment impaired.

Shambaugh believed that Kruger would have been better off in a mental health facility than in Lancaster County Prison.

For an inmate to be involuntarily committed, an applicant must first complete a 302 application form which is generated by the Commonwealth of Pennsylvania.  Lancaster County delegates authorized to review such applications then make determinations based on the content of the application.  If the delegate approves the application, it still must be also be reviewed and approved by a medical doctor.  Judith Erb ("Erb"), a crisis worker for Lancaster County Behavioral Health and Developmental Services, who was designated and trained to review involuntary commitment applications, reviewed Kruger's 302 Petition.  Erb denied the application as she felt that it did not meet the required criteria for commitment. Specifically, she testified that the application lacked the required immediacy, evidence of danger to self, and evidence of danger to another.  If Erb had approved the 302 Petition, it would still have to be additionally approved by a medical doctor pursuant to the Pennsylvania Mental Health Procedures Act, 50 Pa. C.S.A. § 7302(b).

Defendants aver that even if a medical doctor had approved the 302 Petition, there was no guarantee that Lancaster General Hospital would have accepted Kruger as a patient. Shambaugh testified that he knew when he completed the 302 Petition for Kruger that even if Erb had approved the 302 Petition, Kruger would be denied access to emergency mental health care at Lancaster General Hospital unless he had agreed to be bailed out of prison.  In fact, it was the experience of Lancaster County Prison and PrimeCare, that Lancaster General Hospital was

averse to accepting prospective 302 inmates.  Although Defendants aver that both Lancaster County Prison and PrimeCare have made repeated efforts to convince Lancaster General Hospital and other private medical facilities to more readily accept prospective 302 inmates and detainees, Plaintiff denies that they have made such efforts.

Plaintiff further avers that Lancaster County and PrimeCare had a duty and obligation under the law, and pursuant to contract (PrimeCare), to secure an approved mental health facility for involuntary committed prisoners and detainees.  Plaintiff avers that as part of the contract between Lancaster County and PrimeCare, PrimeCare was to secure emergency services for mental health matters, including Section 302 involuntary mental health commitments.  Since the inception of the contract, PrimeCare has not been able to secure a facility that would accept involuntary 302 commitments absent physical injury.  Plaintiff further avers that Shambaugh, Stein, Warden Guarini, Todd Haskins (the Vice President of Operations for PrimeCare), Erb, and Glenn McCarty (the Director of Crisis Intervention for Lancaster County Behavioral Health Developmental Services) have all testified that, since at least 2007, neither Lancaster County nor PrimeCare have secured an approved mental health facility to provide mental health care on an emergency basis to prisoners and detainees at Lancaster County Prison pursuant to a 302 involuntary commitment, unless there was a physical injury involved in the 302.  Any prisoners who were sent to Lancaster General Hospital pursuant to a 302 absent physical injury, would ultimately be returned to the prison without receiving treatment or care.

After Kruger's 302 Petition was denied, he remained on PO III status, and was briefly placed in a camera cell to monitor his eating habits.  Shambaugh next saw Kruger on February 7, 2011, at which time Shambaugh reported that Kruger was suffering delusional

11

disorder, and that his judgment and insight were impaired.  Shambaugh determined that he had

delusions, paranoia, and possible hallucinations, but denied suicidal or homicidal ideation.

Shambaugh noted that Kruger "keeps looking up and asking what is that all about upstairs,

looked at the vent and says they are putting stuff in here to make me crazy."

On February 8, 2011, Shambaugh's assessment was delusional disorder

NOS.  Kruger's judgment and insight were impaired.  Kruger had possible auditory

hallucinations, persecutory delusions, and paranoia, but he denied suicidal or homicidal ideation.

Again, Plaintiff avers that Kruger would often remain silent when specifically asked if he was

suicidal.  During this visit, Kruger reported to Shambaugh that he believed the inmates were

going to kill him, and that he felt scared.  He complained that someone was pumping something

in through the vents, and it made him crazy and lightheaded.  Kruger wanted to know how he

could get out of the prison.  On February 28, 2011, Shambaugh discontinued the camera cell for

Kruger.

The last interaction Stein had with Kruger occurred on March 8, 2011 when she

went to Kruger's cell for a routine mental health check.  At this point, Stein was aware that

Kruger had been removed from the suicide watch, and her plan was to maintain him on

psychiatric observation with continued follow up by mental health later in the week.

Shambaugh's last encounter with Kruger occurred on March 16, 2011.  Upon

assessment, Shambaugh noted that Kruger was struggling with reality, manifested non-bizarre

delusions and paranoia, and his judgment and insight were impaired.  Kruger believed that

inmates were overhearing their conversations.  During the interview with Shambaugh, Kruger

was whispering.  Kruger also stated that he was afraid that the other inmates got his daughter's

cell phone number.  Kruger's diagnosis was delusional disorder, and Shambaugh's

recommendation was that he remain on PO III status.

Less than a week later, on March 22, 2011, Kruger jumped from the second floor

balcony of the MHU, and later died of his injuries.

Plaintiff filed two lawsuits, which have been consolidated for all purposes, against

various defendants on her own behalf and on behalf of the Estate of John H. Kruger.  The first

suit, captioned Kruger v. Lancaster County, et al., United States District Court for the Eastern

District of Pennsylvania, Docket No. 12-0624 ("Suit I"), was brought against Lancaster County

and retired Warden Vincent Guarini ("Guarini" or "Warden"), as well as PrimeCare Medical,

Inc. ("PrimeCare") and its employees, Robert Shambaugh, M.D. ("Shambaugh") and Elicia Stein

("Stein").  In Suit I, Plaintiff asserts a §1983 claim, alleging that Defendants violated Kruger's

constitutional rights and were deliberately indifferent to his medical needs.[5]  Suit I also asserts

that Defendants violated the American with Disabilities Act of 1990 ("ADA") by failing to

provide Kruger with appropriate medical and psychiatric care, as well as failing to provide

appropriate housing and supervision while incarcerated at Lancaster County Prison.  Finally,

Plaintiff avers that even if Erb, the County delegate on the 302 Petition, had approved the 302

Petition, and directed that Kruger be transported to Lancaster General Hospital, it is clear and

undisputed that Defendants knew that Lancaster General Hospital would deny Kruger access to

---

[5]        Although Plaintiff alleges in her First Amended Civil Complaint that the actions of the defendants
violated Kruger's rights under the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution, it
is clear in her brief that she recognizes that the claims are based on the Fourteenth Amendment.  "As a pretrial
detainee incarcerated at Lancaster County Prison, Plaintiff s claim on behalf of the decedent is brought pursuant to
42 U.S.C. § 1983, and properly analyzed under the Fourteenth Amendment. *Morgan-Mapp v. George W Hill Corr.
Facility*, 2008 U.S. Dist. LEXIS 69434 (E.D. Pa. 2008) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239,
244 (1983))."  See Plaintiffs' Brief in Opposition at 32.

their facility as a prison detainee, and he would have been returned to Lancaster County Prison, never receiving the emergency evaluation and care that Shambaugh believed, and affirmed, he needed.  Plaintiff avers that since 2007, prisoners and detainees at Lancaster County Prison have been denied the statutory protections afforded under the law pursuant to the 302 procedure since neither PrimeCare nor Lancaster County has secured an approved mental health facility for emergency mental health care and evaluation. More specifically, the First Amended Civil Complaint sets forth the following claims:

| | | |
|---|---|---|
| • | Count I | Section 1983 Claim Against Warden Guarini, Shambaugh, and Stein |
| • | Count II | Section 1983 Monell Claim Against Lancaster County and Warden Guarini |
| • | Count III | ADA Claim Against Lancaster County and Warden Guarini |
| • | Count IV | Wrongful Death Against All Defendants |
| • | Count V | Survival Action Against All Defendants |
| • | Count VI | Section 1983 Claim Attorney Fees Against All Defendants |
| • | Count VII | Punitive Damages Against Guarini, Shambaugh, and Stein |

The second suit, captioned <u>Kruger v. Lancaster County, et al.</u>, United States District Court for the Eastern District of Pennsylvania, Docket No. 13-01514 ("Suit II"), was brought against Lancaster County alleging that it was deliberately and recklessly indifferent to Kruger's serious medical needs and with deliberate indifference denied the application for 302 commitment and treatment of Kruger.  More specifically, the following claims against Lancaster County remain:

| | |
|---|---|
| • | Count II Wrongful Death |
| • | Count III Survival Action |
| • | Count IV Section 1983 Claim Attorney Fees |

II.     <u>Standard of Review</u>

Summary judgment is appropriate where the record and evidence, taken in the light most favorable to the non-moving party, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-252 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  <u>Anderson</u>, 477 U.S. at 249.  A factual dispute is material only if it might affect the outcome of the suit under governing law.  <u>Id.</u> at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must cite "to particular parts of materials in the record" showing that there is a genuine dispute for trial.  Fed. R. Civ. P. 56(c).  Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.  <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989) (citing <u>Celotex</u>, 477 U.S. at 325).  The non-moving party has the burden of producing evidence to establish *prima facie* each element of its claim.  <u>Celotex</u>, 477 U.S. at 322-323.  If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine dispute as to any material fact, then summary judgment is proper.  <u>Id.</u> at 322; <u>Wisniewski v. Johns-Manville Corp.</u>, 812 F.2d 81, 83 (3d Cir. 1987).  When the non-moving

15

party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' - that is, pointing out to the District Court - that there is an absence of evidence to support the non-moving party's case." Jones v. Indiana Area Sch. Dist., 397 F. Supp.2d 628, 642 (W.D. Pa. 2005) (quoting Celotex, 477 U.S. at 325).

III.    Discussion

    A.    Civil Rights Claims Against Robert Shambaugh, Elicia Stein, and Vincent Guarini.

      It is clearly established that the suicide of a pretrial detainee can support a recovery under § 1983. See Colburn v. Upper Darby Township, 946 F.2d 1017, 1023 (3d Cir. 1991) ("Colburn II"); see also Williams v. Borough of W. Chester, 891 F.2d 458 (3d Cir. 1989); Freedman v. Allentown, 853 F.2d 1111 (3d Cir. 1988).  In order to establish liability under § 1983 in prison suicide cases, a plaintiff must prove: (1) the detainee had a "particular vulnerability to suicide," (2) the custodial officer or officers knew or should have known of the vulnerability, and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability.  See Colburn v. Upper Darby Township, 838 F.2d 663 (3d Cir. 1988), cert. denied, 489 U.S. 1065, 109 S. Ct. 1338, 103 L. Ed. 2d 808 (1989) ("Colburn I"). To prevail, plaintiff must demonstrate "[a] level of culpability higher than a negligent failure to protect from self-inflicted harm." Colburn II, 946 F.2d at 1024.

      To demonstrate a "particular vulnerability to suicide," plaintiff must present affirmative evidence from which a reasonable jury could conclude that a "strong likelihood" exists that self-inflicted harm will occur. The "mere possibility" of self-inflicted harm is insufficient. Id. (quoting Torraco v. Maloney, 923 F.2d 231, 236 (1st Cir. 1991)).  Moreover, even where a strong

likelihood exists, the plaintiff must establish that the custodial officials "knew or should have known" of that strong likelihood.  Colburn II, 946 F.2d at 1024.  Whether the custodial officials "knew or should have known" can be demonstrated when the officials have "actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities."  Id. at 1025 n.1 (citations omitted).  "The 'strong likelihood' of a suicide must be 'so obvious that a lay person would easily recognize the necessity for preventative action.'"  Id.  (quoting Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326 (3d Cir. 1987) (citations omitted)).

Plaintiff has established sufficient facts upon which a reasonable jury could conclude that Kruger presented a heightened risk for suicide.  Upon intake at the prison, Kruger admitted to a past suicide attempt; showed signs of depression; appeared anxious, panicked, afraid, or angry; and was acting or talking in a strange manner.  Kruger was also determined to be more at risk for suicide because it was his first incarceration; he experienced a recent loss of job; was worried about financial problems; feared losing his home; and had a history of alcohol abuse.  Even more significant, however, was the fact that Kruger admitted to feeling suicidal just prior to his incarceration as noted by the records of his family physician at General Internal Medicine of Lancaster.  In addition, his family reported that he was acting strange during the week prior to his incarceration.  Kruger was placed on Level II suicide watch following his intake at Lancaster County Prison.

While in prison, Kruger was reported as being delusional, paranoid, and disorganized.  Even Shambaugh appeared to be concerned by noting in the 302 Petition that Kruger's behavior was unpredictable as long as he remained psychotic and paranoid.  Shambaugh

17

also noted in the 302 Petition that there was a possibility that Kruger could hurt himself or someone else.  Kruger refused medication, had no insight, and his judgment was impaired.  At times, Kruger would neither deny nor confirm suicidal ideation.  In fact, Plaintiff avers that Kruger would often remain silent when specifically asked if he was suicidal.  Kruger struggled with reality, manifested non-bizarre delusions and paranoia, and was diagnosed with delusional disorder.  Thus, a reasonable jury could conclude that Kruger presented a heightened vulnerability for suicide.

With respect to the knowledge of Shambaugh, Stein, and Warden Guarini, we find that a reasonable jury could find that each of these individuals knew or should have known of Kruger's particular vulnerability to suicide.  In fact, Plaintiff has demonstrated that both Shambaugh and Stein had actual knowledge of Kruger's recent suicide threat, as well as his prior history of a suicide attempt.  Each of these individuals were aware that Kruger had been placed on Level II suicide watch following his intake to Lancaster County Prison.  In fact, both Stein and Shambaugh approved of that decision.  In addition, they were in receipt of the family doctor records of General Internal Medicine of Lancaster, which revealed that Kruger had admitted to suicidal thoughts in the weeks preceding his incarceration.  Notably, Shambaugh testified that by the time they received and examined the records from Kruger's family doctor, Kruger was already off Level II suicide watch.  Shambaugh testified that if he had received the family doctor records earlier, Kruger would have remained on suicide watch.

Viewing the evidence in the record in the light most favorable to Plaintiff, and drawing all reasonable inferences accordingly, a reasonable jury could also find that Warden Guarini knew or should have known of Kruger's particular vulnerability of suicide.  Knowledge

18

can reasonably be imputed to Warden Guarini by his very own admission during his deposition that although it might not be at precisely the same moment, the "Warden gets told everything."  It is, therefore, not unreasonable to believe that Warden Guarini was aware that Kruger had initially been placed on Level II suicide watch, and that a 302 Petition was attempted on his behalf, but subsequently denied.

Finally, with respect to whether these individuals "acted with reckless indifference" to Kruger's particular suicidal vulnerability, we find that Plaintiff has set forth a triable issue of fact.  Shambaugh, Stein, and Warden Guarini were all charged with the responsibility to ensure that detainees and inmates at Lancaster County Prison were provided adequate medical care.  With respect to Shambaugh in particular, we find it troublesome that he testified that if he had seen the family doctor records of Kruger (indicating that Kruger was suicidal just prior to his incarceration) before Kruger's removal from suicide watch, "he would have stayed on suicide status, of course."  It is unknown, therefore, why Shambaugh did not change Kruger's status back to suicide watch after he reviewed the records of Kruger's family doctor relative to his recent suicidal ideation.  Further, we find it curious as to why Stein didn't question Shambaugh's decision to remove Kruger from suicide watch when she was the individual who initially placed him on that status, and, presumably, she would have also reviewed the records from Kruger's family doctor, which confirmed Kruger's recent suicidal ideation.

Moreover, Plaintiff has offered evidence demonstrating that each of these individuals, including Warden Guarini, testified that they were aware that neither Lancaster County Prison nor PrimeCare had secured an approved mental health facility to send detainees

19

and inmates pursuant to a straight 302 involuntary commitment[6] since approximately 2007. Plaintiff avers that because no appropriate mental health facility had been secured for 302 confinements, this amounted to a knowing denial of access to emergency medical care for detainees and inmates in need, and constitutes deliberate indifference.

Defendants aver in response that although they have attempted to secure a facility that would be willing to take inmates subject to a 302, they do not possess the authority to compel private hospitals, such as Lancaster General Hospital, to accept inmates pursuant to a 302 involuntary confinement.  Defendants have not come forward with any concrete record evidence, however, detailing their attempts to secure such a facility.  Viewing the evidence in the record in the light most favorable to Plaintiff, and drawing all reasonable inferences accordingly, we find that a reasonable jury could find that the acts and/or omissions of Shambaugh, Stein, and Warden Guarini constituted deliberate indifference.  At the very least, Plaintiff has raised triable issues of fact, and summary judgment is denied.

B.    Qualified Immunity Analysis With Respect to Vincent Guarini.

Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights known to a reasonable person.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  It is the defendants' burden to establish that they are entitled to such immunity. See Stoneking v. Bradford Area School District, 882 F.2d 720, 726 (3d Cir. 1989).

---

[6]    There was an exception for 302 involuntary commitments that were accompanied by a physical injury.

Courts apply a two-step inquiry to determine whether a defendant is entitled to qualified immunity.  First, a court must determine whether a constitutional right was violated.  Second, a court must determine whether the right was clearly established such that a reasonable officer would have known the conduct violated their rights.  Saucier v. Katz, 533 U.S. 194, 201-02 (2001).  In Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 818 (2009), the Supreme Court found a court may address whether a right was clearly established before addressing whether a constitutional right was violated.  "Under the test announced in Harlow, reasonableness is measured by an objective standard; arguments that the defendants desired to handle or subjectively believed they had handled the incidents properly are irrelevant." Stoneking, 882 F.2d at 726 (citing Anderson v. Creighton, 483 U.S. 635, 641 (1987)).

Because there is a genuine issue of fact as to whether Warden Guarini was deliberately indifferent, he has not carried his burden to establish that he is entitled to qualified immunity.  See Carter v. City of Philadelphia, 181 F.3d 339, 356 (3d Cir. 1999) (holding that if plaintiff succeeds in establishing defendants acted with deliberate indifference to plaintiff's constitutional rights, then defendant's conduct was not objectively reasonable and qualified immunity defense is not available).  Therefore, we reject the qualified immunity claim.

C.      Civil Rights Claims Against PrimeCare Medical and Lancaster County.

A municipality is liable under § 1983 when a plaintiff can demonstrate that the municipality itself, through the implementation of a municipal policy or custom, causes a constitutional violation. Monell v. New York City Dept. of Social Services, 436 U.S. 658, 691-95, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).  Liability will be imposed when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is

21

the "moving force" behind the constitutional tort of one its employees. Polk County v. Dodson, 454 U.S. 312, 70 L. Ed. 2d 509, 102 S. Ct. 445 (1981). Liability cannot be predicated, however, on a theory of respondeat superior or vicarious liability. Monell, 436 U.S. at 693-94. A plaintiff can establish causation by "demonstrating the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." Board of County Commissioners of Bryan County. Oklahoma v. Brown, 520 U.S. 397, 407, 137 L. Ed. 2d 626, 117 S. Ct. 1382 (1997).

       With respect to this matter, Plaintiff avers that since at least 2007, Lancaster County Prison and PrimeCare have adopted a custom or practice which consists of a course of conduct that has been so permanent and widespread that it has the force of law. More specifically, Plaintiff avers that since approximately 2007, Lancaster County and PrimeCare have failed to secure an approved or designated mental health facility to accept detainees and prisoners from Lancaster County Prison who are in need of emergency medical treatment and evaluation pursuant to a 302 involuntary commitment. Based on our review of the record, it appears that several witnesses have confirmed that there was no approved or designated mental health facility that would accept detainees and prisoners pursuant to a straight 302 involuntary commitment.

       Plaintiff further avers that this practice in Lancaster County deprived Kruger of his constitutional right to adequate medical care, and asserts that the Defendants knew that there was no chance that Kruger would be admitted or evaluated for emergency mental health care pursuant to a 302 involuntary commitment because Lancaster General Hospital would not accept detainees or prisoners pursuant to a 302 commitment, unless there was a physical injury component. In fact, the record demonstrates that when Shambaugh completed the 302 Petition, it was his hope that

Kruger would agree to be bailed out of Lancaster County Prison contemporaneous with his application for the 302 involuntary commitment because Shambaugh believed that only by breaking his status as a detainee would Kruger be accepted into Lancaster General Hospital pursuant to the 302. The record further demonstrates that Shambaugh thought that Kruger would benefit from receiving treatment for his mental issues in a mental health facility, as opposed to Lancaster County Prison.

Because of his mental issues, however, Kruger refused to be bailed out, and his 302 Petition was ultimately denied. Although Lancaster County avers that their delegate Erb appropriately considered the 302 Petition, and denied it on the four corners of the document, Plaintiff responds by asserting that Erb was well aware at the time she reviewed the 302 Petition that there was no chance Kruger would be admitted into Lancaster General Hospital on the 302 absent a physical injury. A reasonable jury could conclude that the 302 procedure in place for Kruger was an empty procedure, and would also be an empty procedure for all detainees and prisoners in his position, for whom a 302 involuntary commitment was sought without any physical injury.

Lancaster County and PrimeCare assert that neither of them had the authority to compel private hospitals to accept inmate pursuant to a 302 involuntary commitment. Neither Lancaster County nor Primecare, however, have provided documents to support a claim that reasonable efforts have been made since 2007 to attempt to find an approved or designated mental health facility. Plaintiff submits that this demonstrates a lack of effort on the part of the Defendants, and that it, in turn, demonstrates deliberate indifference to Kruger's constitutional

right to adequate medical care.  The adequacy of the efforts of Lancaster County and PrimeCare in attempting to secure a designated mental health facility is a disputed issue of material fact.

Based on the foregoing, and our review of the record as a whole, we believe that genuine issues of material fact exist as to whether Lancaster County and Primecare's failure to secure an approved or designated mental health facility to accept detainees and prisoners from Lancaster County Prison who are in need of emergency medical treatment and evaluation pursuant to a straight 302 involuntary commitment, amounted to deliberate indifference.  Once evidentiary proof is adduced, the issue of proximate cause is best left to the determination of the jury.  A.M  v. Luzerne County Juvenile Detention Center, 371 F.3d 572, 581 (2004).  Accordingly, we deny summary judgment on these claims.

      D.    Americans With Disabilities Act ("ADA") Claims Against Lancaster County and Vincent Guarini.

Title II of the ADA (42 U.S.C. §§ 12131-12134) states, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services or activities of a public entity or be subjected to discrimination by such entity."  42 U.S.C. § 12132 (2006).[7]  In order to sustain her ADA claim against Lancaster County, Plaintiff must establish the following as to Kruger: (1) he is a qualified individual; (2) with a disability; (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability.  Herman v. County of York, 482

---

[7]     The United States Court of Appeals for the Third Circuit has specifically stated that the Americans with Disabilities Act provides protections to persons with disabilities who are incarcerated in prisons or otherwise institutionalized by the state or its instrumentalities. Yeskey v. Commonwealth of Pa Department of Corrections, 118 F 3d 168, 171 (3d Cir. 1197).  Defendants do not appear to dispute that the ADA provides protection to prisoners and detainees from discrimination based upon disabilities.

F. Supp.2d 554, 566 (M.D. Pa. 2007) (quoting <u>Bowers v. NCAA</u>, 475 F.3d 524, 553 n. 32 (3d Cir. 2007)).

As noted by Plaintiff, Kruger displayed mental health issues including depression, and a recent suicide ideation, prior to his incarceration at Lancaster County Prison. While incarcerated Kruger was diagnosed with the following conditions: depressive disorder, NOS; psychotic disorder NOS; and delusional disorder, non-bizarre, paranoid. When Shambaugh completed the 302 Petition, he opined that Kruger was "severely mentally disabled," and posed "a clear and present danger of harm to others or himself." Kruger appears to be a qualified individual with a disability.

Plaintiff contends that Lancaster County's failure to provide for an approved mental health facility for emergency mental health care pursuant to a 302 involuntary commitment resulted in a denial of a service program or activity because of Kruger's disability and status as a detainee at Lancaster County Prison. Plaintiff avers that Kruger refused medications prescribed in Lancaster County Prison for his mental illness because of paranoid delusions he associated with those medications. Plaintiff further avers that if Kruger had access to an approved mental health facility pursuant to a 302 involuntary commitment, he would have been compelled to take those medications. In addition, Plaintiff has averred sufficient facts which seem to indicate that a detainee or prisoner subject to a 302 involuntary commitment with a physical injury was treated differently that a detainee or prisoner subject to a 302 with no apparent physical injury. In this

case, we note that Kruger's second 302 Petition was approved when it was accompanied by a physical injury.[8]

Based on the record as a whole, we conclude that a reasonable jury could find that Plaintiff has adequately set forth the required elements of a prima facie case of discrimination under Title II of the ADA, and genuine issues of material fact exist with respect to Plaintiff's claim against Lancaster County.  Accordingly, we deny summary judgment on this basis.

However, we agree with Defendants that the ADA claim against Warden Guarini fails as a matter of law.  The Third Circuit has held that individual defendants cannot be held liable for violations of Title II of the ADA.  Emerson v. Thiel College, 296 F.3d 184, 189 (3d Cir. 2002).  This is because the term "public entity" in Title II of the ADA is not defined to include individuals.  Yeskey v. Commonwealth of Pa Department of Corrections, 76 F. Supp.2d 572, 574-575 (M.D. Pa. 1998).  Plaintiff does not appear to dispute this aspect of Defendants' motion.  Accordingly, we grant summary judgment in favor of Warden Guarini on this claim.

E.     Survival and Wrongful Death Claims.

Defendants, Lancaster County and Warden Guarini, aver that Plaintiff's claims under state law are barred by the express provisions of the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa. C.S.A. § 8541, et seq.  The general provision with respect to governmental immunity dictates that:

> Except as otherwise provided in this subchapter, no local agency shall be liable for any damage on account of any injury to a person or property caused by any act of the local agency or any employee thereof or any other person.

---

[8]     Following Kruger's jump from the second floor balcony of the MHU on March 22, 2011, a second 302 Petition was prepared on his behalf.  This 302 Petition was approved by Erb.

42 Pa. C.S.A. § 8541.  In order for a claim to be maintained against a local agency, two conditions must be met.  First, the damages sought in the present suit must be recoverable under the common law, or a statute creating a cause of action absent the defenses provided in the act; and second, that Plaintiff's injury "was caused by the negligent acts of the local agency or employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (d)."  42 Pa. C.S.A. § 8542(a).

Section 8542(b) provides that a local governmental agency is immune from any suit based upon the negligent acts of the agency or an employee, unless the cause of action relates to one of eight categories.[9]  These exceptions are to be narrowly construed.  See Mascaro v. Youth Study Ctr., 523 A.2d 1118, 1123 (1987). Defendants aver that none of the exceptions apply in the present case, and thus, Plaintiff's claims are barred. See Bornstad v. Honey Brook Twp., 2004 U.S. Dist. LEXIS 9690 at 1, 14 (E.D. Pa. 2004 )(holding that "Plaintiff's wrongful death and survival claims against [the municipality defendants] are barred by the Tort Claims Act and must be dismissed").

However, Plaintiff avers that § 8550 of PSTCA provides that a municipal employee may be held liable only when his or her conduct constitutes a "crime, actual fraud, actual malice or willful misconduct."  42 Pa. C.S. § 8550.  Because we find that Plaintiff has presented triable issues of fact with respect to whether Lancaster County and Warden Guarini's

---

[9]        The eight exceptions to immunity are: (1) vehicle liability; (2) the care, custody or control of personal property; (3) the care, custody or control of real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; or (8) the care, custody or control of animals. 42 Pa. C.S.A. § 8542(b).

actions and/or inaction constitutes deliberate indifference, we deny summary judgment on this basis.

F.      Punitive Damages Claims.

        Punitive damages are recoverable in § 1983 actions where the defendant had a reckless or callous disregard to the federally protected rights of others.  Smith v. Wade, 461 U.S. 30, 35, 51, 75 L. Ed. 2d 632, 103 S. Ct. 1625 (1983).  This is the same standard as for § 1983 liability, "[b]oth require a determination that the defendants acted with deliberate indifference or reckless disregard . . . ."  Walsh v. Mellas, 837 F.2d 789, 801 (7th Cir. 1988).  As we noted above, there are material issues of fact with respect to whether Shambaugh, Stein, and Warden Guarini were deliberately indifferent to Kruger's risk of suicide.  Accordingly, we deny summary judgment on this basis.

IV.     Conclusion

        We grant Vincent Guarini's motion for summary judgment with respect to the individual ADA claim contained in Count III of the First Amended Civil Complaint (Suit I). Defendants' motions for summary judgment are denied in all other respects.

        An appropriate order follows.